UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| KEE LEE dba CHIN'S MARKET AND KITCHEN, | ) ) ) | CASE NO. 1:11-CV-0881 AWI DLB |
| Plaintiff, | ) ) | ORDER RE: SUMMARY JUDGMENT |
| v. | ) ) | |
| UNITED STATES OF AMERICA; AND DOES 1 through 100, inclusive, | ) ) ) | |
| Defendants. | ) ) | |

## I. History

Plaintiff Kee Lee is the owner of Chin's Market and Kitchen ("Chin's Market"), a small grocery store and restaurant that also sold large roasted meats primarily to members of the local Hmong community. In the spring of 2009, Chin's Market started participating in the food stamp program which is administered by the United States Department of Agriculture Food and Nutrition Service ("FNS"). The FNS examined the food stamp redemption records from Chin's Market over the period October 2009-March 2010 and became suspicious of certain transactions. The FNS made an on-site visit to Chin's Market in April 2010. The FNS accused Plaintiff of redeeming food stamps for some amount of money (typically 50% of the face value of the redemption) instead of food, commonly termed trafficking. The FNS sent Plaintiff a formal charge letter dated May 21, 2010 detailing their investigation and soliciting a response. Doc. 24,

Administrative Record, 50-52.[1]  The FNS deemed Plaintiff's defense against the charges insufficient and issued a final agency decision on April 28, 2011, finding that Plaintiff trafficked food stamps and permanently disqualified him from participating in the program under 7 C.F.R. § 278.6(e)(1)(i). Doc. 24, Administrative Record, 177-190.  Plaintiff filed suit in federal court against Defendant United States, challenging this determination per 7 C.F.R. § 279.7.  The United States filed the present motion for summary judgment, which Plaintiff opposes.

## II. Legal Standards

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying the portions of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it might affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn, 322 F.3d 1039, 1046 (9th Cir. 2002).  A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  Where the non-

---

[1] The Administrative Record compiled by the FNS has been lodged in this case as reflected in Docket Entry 24.

moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim. See James River Ins. Co. v. Schenk, P.C., 519 F.3d 917, 925 (9th Cir. 2008). If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th Cir. 2000). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Juell v. Forest Pharms., Inc., 456 F.Supp.2d 1141, 1149 (E.D. Cal. 2006); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004). "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007); Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002). Further, a "motion for summary judgment may not be defeated ...by evidence that is 'merely colorable' or 'is not significantly probative.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006). Additionally, the court has the discretion in appropriate circumstances to consider materials that are not properly brought to

its attention, but the court is not required to examine the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references. See Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003). If the non-moving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment. See Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1103 (9th Cir. 2000).

### III. Statement of Material Facts

1. Kee Lee applied for the store, Chin's Market and Kitchen ("Chin's Market"), to participate in the Food Stamp Program and completed an application providing that they agreed to follow the Food Stamp Program regulations

    Undisputed.

2. He agreed that exchanging cash for food stamp benefits ("trafficking") was a violation of the Food Stamp Program regulations. He agreed that any violation of the governing regulations could result in the disqualification of Chin's Market and Kitchen from participation in SNAP.

    Undisputed.

3. In the fall of 2009, FNS, which monitors retail store compliance with the governing regulations, was alerted to suspicious EBT activity, potentially trafficking, at Chin's Market. Trafficking means "the buying or selling of coupons . . . or other benefit instruments for cash or consideration other than eligible food." 7 C.F.R. § 271.2.

    Undisputed.

4. The suspicious EBT transactions at Chin's Market included high-dollar transactions, depletion of almost an entire monthly benefit in one transaction, multiple transactions of high amounts in a short time frame, and purchases in round-figure amounts (or other same-cents values).

    Undisputed.

5. FNS compared the EBT data at Chin's Market and Kitchen with other similarly situated stores, and because the high number of suspicious EBT transactions at Chin's Market and Kitchen occurred for several months, it was determined that a store visit would be conducted to further evaluate the suspect EBT transactions.

    Disputed.  No other stores comparable or similarly situated.

6. On April 13, 2010, FNS conducted an in-store inspection of Chin's Market and spoke with Lee. ("Store owner Lee followed reviewers around the store.")

    Undisputed.

7. The inside of Chin's Market was typical of a small-sized grocery store with a substantial restaurant business that catered to an Asian, mostly Hmong, customer base.

    Disputed.  No other stores comparable or similarly situated.

8. Upon inspection, Chin's Market did not sell any dairy products, produce, fresh meat, poultry or seafood. The eligible SNAP items consisted primarily of bagged rice, dry noodles, a variety of sauces and canned fruits and vegetables. Chin's Market also sold ineligible items such as household, pharmacy and hardware items in the retail area. There were five shopping carts, two of which were outside the store and a third was filled with kitchen equipment.

    Undisputed.

9. Chin's Market had one EBT point of service device and one cash register without a conveyor belt or an optical scanner.

    Undisputed.

10. Plaintiff told the FNS' representatives that he sells pigs, ducks and chicken by special order that is picked up by the customer after it has been prepared. He stated that he marks up the meat for sale at $2.25/$2.50 per pound. The most expensive non-meat items sold were 50 pound bags

1  of rice for $38.00, and a gallon of chili paste for $12.99.

2      Disputed.  The mark up referenced is for entrails, tripe, and mixed meat parts, not whole
3  roasted ducks and pigs.

4

5  11. Because the EBT transactions from Chin's Market substantially deviated from the state-wide
6  trends and the transactions at comparable stores for a six month period, as well as the
7  information obtained during the store visit, FNS sent a Charge Letter ("Charge Letter") to
8  plaintiff, detailing the EBT transactions FNS believed were in violation of the Food Stamp
9  Program regulations.  The documents attached to the Charge Letter alleged the following unusual
10 and irregular EBT transaction activity as indicative of exchanging cash for food stamp benefits:
11     a. 130 household EBT transactions of excessively large purchases ranging from
12 approximately $80.00 to $375.00 ("high-dollar transactions").
13     b. 22 household transactions where multiple withdrawals were made from the accounts
14 of more than one food stamp household within unusually short time frames (i.e., "rapid
15 transactions").
16     c. 83 household EBT transactions ending in the same-cents value (i.e., total amounts
17 ending in even dollar amounts, $xx.00, $xx.95 or $xx.99).
18     d. 39 transactions where the same food stamp household made multiple withdrawals
19 within unreasonable time frames.
20     e. 4 households' transactions depleting 98 to 100 percent of the household's available
21 food stamp benefits in one day ("balance depletions").
22     Disputed.  No other stores comparable or similarly situated.
23

24 12. The "high-dollar transactions" included the suspicious pattern of Household 1690 in
25 spending more at Chin's Market than at one large Asian supermarket where the household
26 shopped less than two hours later as follows:
27     2/10/10 8:30:13 SM Bingo Trading $40.32
28     2/10/10 15:22:53 MG Chin's Market & Kitchen $166.12

6

| | |
|---|---|
|1| 2/11/10 16:00:26 MG Chin's Market & Kitchen $250.00 |
|2| 2/21/10 15:03:27 MG Chin's Market & Kitchen $251.63 |
|3| 2/21/10 16:42:05 LG XC Lucky Supermarket $03.99 |

MG is the abbreviation for a medium grocery that carries a moderate selection of all four staple food categories (meats, dairy, breads, and vegetables). LG is the abbreviation for a large grocery store that carries a wide selection of all staple items and usually has multiple check out lanes.

 Disputed. No other stores comparable or similarly situated.

13. The combination of "high-dollar" and "balance depletions" were an identified pattern of household number 9777 cashing out of almost an entire month's benefit in one transaction at Chin's Market and Kitchen for the months of January through March 2010 as follows:

 1/07/10  $190.00 [99 % of benefits – $.04 remaining]
 2/10/10  $125.00 [96 % of benefits – $5.04 remaining]
 3/08/10  $134.68 [96 % of benefits – $5.96 remaining]

 Disputed. No other stores comparable or similarly situated.

14. The suspicious "rapid" transactions included a $138.78 transaction that was completed 99 seconds after the prior transaction even though it supposedly required a sorting of items and manual entry into the cash register. Because the EBT card did not work through the POS machine, the account number had to be manually entered by the household as well as the personal identification number.

 Disputed. No other stores comparable or similarly situated.

15. Another "rapid" transaction was a $138.61 purchase that occurred in 96 seconds.

 Disputed. No other stores comparable or similarly situated.

16. The irregular "same-cents" transactions included EBT transactions of $375.00 on October 8, 2009; $120.00 on October 11, 2009, and $118.00 on October 15, 2009 by one household.

Undisputed.

17. As to suspicious multiple purchases by a household in a short amount of time, FNS identified a household that supposedly spent $166.95 at 2:55 p.m. at Chin's Market and then returned to Chin's Market at 3:03 p.m., just eight minutes later, and spent an additional even $120.00.

Disputed. No other stores comparable or similarly situated.

18. After outlining the irregular EBT transactions at Chin's Market, the Charge Letter concluded by advising plaintiff that "[i]f it is determined that your firm committed the trafficking violations noted above, it will be permanently disqualified from SNAP provided by section 278.6(e)(1)."

Disputed. No other stores comparable or similarly situated.

19. The Charge Letter informed plaintiff that FNS may impose a civil money penalty in lieu of permanent disqualification for trafficking if certain criteria were satisfied. Plaintiff never requested a civil money penalty, nor was the required documentation submitted for a civil money penalty.

Undisputed.

20. Plaintiff telephoned FNS to explain the irregular EBT transactions as based on, among others, his being the only market in Fresno selling pigs and ducks, and his customers order the cooked pigs and ducks ahead of time which accounts for the rapid transactions. He also stated that he would provide receipts for his pig orders.

Undisputed.

21. Plaintiff provided a written response to FNS' Charge Letter again explaining that the high-dollar transactions were purportedly from purchases of whole pigs, ducks, and bulk rice, the multiple transactions from individual household accounts were based on the households requesting items that were not available, but then became available later in the day or the next

day. He claimed that the same-cents transactions were based on sales of a half pig for $125.00, a pig head for $25.00 and pork intestines were sold by the pound, and the rapid transactions were based on households ordering over the phone, and when they got to Chin's Market they would add items that are then rung up after the first transaction. His written response included invoices for his purchases of the meat products from his vendors, but no receipts of sales of presold ducks or pigs at Chin's Market.

    Undisputed.

22. FNS considered plaintiff's responses to the Charge Letter and determined the claims he provided did not overcome the findings of trafficking.

    Disputed.  No other stores comparable or similarly situated.

23. FNS reviewed the invoices submitted by plaintiff for his meat (duck, pig, pork) as well as his other staple items such as rice and determined that with the sales mark-up stated during the store visit, his EBT redemptions exceeded his supply of products. Applying plaintiff's 50% mark-up to the invoices submitted there was not enough rice or meat purchased to support the redemptions.

    Disputed.  The mark up referenced is for entrails, tripe, and mixed meat parts, not whole roasted ducks and pigs.

24. FNS also contacted another Fresno market, TC Fresh, located less than three miles from Chin's Market, that also specialized in Asian foods and confirmed that it sold pigs, ducks another items to the Asian community.

    Disputed.  No other stores comparable or similarly situated.

25. The household shopping patterns were also evaluated and it was revealed that the households shopping at Chin's Market also shopped at large grocery stores and supermarkets.

    Disputed.  Chin's Market's primary business is selling roasted meat items; it is not a general grocery store.

26. After full consideration of plaintiff's responses, FNS sent plaintiff a determination letter concluding that trafficking took place at Chin's Market.

    Undisputed.

27. The determination letter also explained that the sanction to be imposed for a finding of trafficking under the Food Stamp Act regulations was permanent disqualification and he was not eligible for a civil money penalty because he failed to timely submit sufficient evidence demonstrating that he established and implemented an effective compliance policy and program.

    Undisputed.

28. Plaintiff timely requested administrative review, and in September 2010, he reiterated he sold cooked ducks and pigs, which he cooked the day before and stored in his cooler as well as bulk rice. He also provided photographs of his meat and meat-storage container.

    Undisputed.

29. In response to FNS' findings that his SNAP redemptions exceeded the amount of products from his inventory receipts, three months later in January 2011, plaintiff submitted amended tax returns regarding his sales at Chin's Market now reflecting sales over $120,000.

    Undisputed.

30. After full consideration of FNS' findings, plaintiffs explanations and documentation, Administrative Review Officer upheld the permanent disqualification of Chin's Market for engaging in trafficking was proper under the Food Stamp Act regulations. In upholding the finding of trafficking at Chin's Market, the Administrative Review Officer reasoned: "42 of the individual households made purchases at large grocery stores or supermarkets in addition to the purchases made at [Chin's Market]. [T]he Field Office contacted a local authorized store, TC Fresh Meat, and verified that the products sold at Chin's Market & Kitchen were also available at TC Fresh Meat. [T]he area [is] well served by authorized stores, including grocery and

supermarkets that cater to Asian, especially Hmong, customers and ... many of the customers whose shopping patterns were analyzed also used those authorized stores during the period examined. It is highly unlikely that households would routinely spend SNAP benefits in such large amounts at a store with limited supply of staple foods, as recorded during the April 13, 2010 visit, as opposed to at large grocery or supermarkets where the inventory is far greater, the selection is more varied, and the prices are potentially more attractive."

      Disputed.  No other stores comparable or similarly situated.

31. Plaintiff cannot identify any of the items purchased for any of the 553 violations of the Food Stamp Program regulations identified in the Charge Letter.

      Disputed.  Though Plaintiff can not provide receipts for each purchase, he can identify the products.

**IV. Discussion**

As this matter has proceeded through an administrative proceeding, the posture of this case is unusual.  Review "shall be a trial de novo by the court in which the court shall determine the validity of the questioned administrative action in issue." 7 U.S.C. § 2023(a)(15).  "The burden is placed upon the store owner to prove by a preponderance of the evidence that the violations did not occur." Kim v. United States, 121 F.3d 1269, 1272 (9th Cir. 1997).  "[T]he agency action stands, unless the plaintiff proves that it should be set aside." Redmond v. United States, 507 F.2d 1007, 1011-12 (5th Cir. 1975).  "In order to preclude summary judgment, Plaintiff must raise material issues of fact as to each of the violations charged....Since permanent disqualification is warranted on 'the first occasion' of coupon trafficking, it is Plaintiff's burden to raise material issues of fact as to each of the transactions set forth as suspicious by the FNS." Kahin v. United States, 101 F. Supp. 2d 1299, 1303 (S.D. Cal. 2000); see also McClain's Market v. United States, 411 F. Supp. 2d 772, 777 (N.D. Ohio 2005).

The FNS has identified a total of 553 suspicious incidents involving food stamp redemption at Chin's over the October 2009-March 2010 time frame. Doc. 31, Reply, 1:24-25.

11

These incidents fall into a number of distinct categories. First, there are 130 high-dollar transactions ranging from $81.36 to $375.00. Doc. 24, Administrative Record, 53-76. For a grocery of Chin's size, the FNS determined that these transactions are unusually large. The FNS observed that "The inside of Chin's Market was typical of a small-sized grocery store with a restaurant business that catered to an Asian, mostly Hmong, customer base. Upon inspection, Chin's Market did not sell any dairy products, produce, fresh meat, poultry or seafood. The eligible SNAP items consisted primarily of bagged rice, dry noodles, a variety of sauces, and canned fruits and vegetables....Lee told the FNS's representatives that he sells pigs, ducks and chicken by special order that is picked up by the customer after it has been prepared." Doc. 23, Part 1, Brief, 3:15-23. Plaintiff asserts that the prevalence of large transactions is due to the fact that he sells large roasted meats to members of the Hmong community for celebrations: "Chin's is different from FNS perception of Asian Markets. Kee Lee has consistently in phone calls, letters and other documentation provided to FNS, stated and proven that Chin's is a 'specialty' store. They sell pre-cooked whole roasted: Whole pigs, ½ pigs, pigs heads, tripe and other parts along with pre-cooked whole roasted ducks. In fact, Kee Lee has stated emphatically that he is the only store in the central valley surrounding Fresno, that sells this particular product. His clientele is primarily Hmong community of which Fresno county has a high population. The Hmong culture when there is anything to celebrate, does so with huge feasts of pre-cooked, whole roasted: Whole pigs etc as noted above, for several days of special occasions such as engagements, marriage, childbirth, death, new jobs, new home, and particularly education successes such as graduation at any level." Doc. 27, Lee Declaration, 2:5-14. Distinctive practices of ethnic communities may explain why the pattern of food stamp usage in a store does not fit the expectations of the FNS, but such an explanation is insufficient to defeat a motion for summary judgment in the absence of proof as to specific transaction challenged. See McClain's Market v. United States, 411 F. Supp. 2d 772, 777 (N.D. Ohio 2005) ("While the Court agrees that Plaintiff's explanations about the spending patterns of his Somali customers may tend to negate some of the inferences from the EBT data and raise some material issues of fact, they do not sufficiently account for all the suspicious activity....Hubbard's affidavit presents no

explanation of any of the 149 transactions asserted against plaintiff, but merely presents general justifications for large expenditures"). Similarly, in this case, Plaintiff admits that "he was not able to find the specific receipts for specific purchases showing the large purchases of Chin's specialty meat products." Doc. 27, Lee Declaration, 3:22-23. Instead he is only able to produce a single receipt for a sale on July 1, 2010 (outside of the time period the FNS was examining) for a $235 sale of large meat for a wedding and a mock-up receipt that he believes is typical of his sales. Doc. 27, Ex. C, 28-29. In addition, he provided pictures of the roast meats, whole pigs, and whole fowl in the cooler at Chin's Market. Doc. 27, Ex. B, 11-26. This evidence is insufficient to defeat summary judgment as it does not raise material issues of fact as regards to each of the 130 suspicious high-dollar transactions identified by the FNS.

Over the same time period (October 2009-March 2010) the FNS also identified 39 transactions in which multiple charges to the same food stamp account were made in quick succession, from minutes to 24 hours. Doc. 24, Administrative Record, 77-81. Additionally, there were 22 transactions that involved multiple large charges from different food stamp accounts that happened within seconds or minutes of each other; the FNS thought there was suspiciously little time in between to ring up the items necessary to constitute the large bills. Doc. 24, Administrative Record, 96-98. The FNS also discovered 83 instances of even dollar value transactions. Doc. 24, Administrative Record, 82-95. Finally, the FNS also found 4 instances where the large remaining amount of an account's balance was depleted in a single or multiple charges in quick succession. Doc. 24, Administrative Record, 99. The FNS found all of these transactions unusual and suspicious. In response to some of these claims, Plaintiff argues that "When [customers] get to the store, they sometimes remember other items. They may even go to the car and then decide they want something else and come back to the store. The culture likes to bargain, and asks for a discount. When asked, or on his own, Kee Lee will round off the cents portion of the amount owed." Doc. 26, Plaintiff's Statement of Facts, page 7, Fact 12. While the cultural explanation of even dollar transactions is reasonable, Plaintiff provides no solid record of this practice. Again, Plaintiff did not provide any receipts for these transactions. Further, the cultural explanations do not explain the other suspicious transactions raised by the

FNS. See Young Choi, Inc. v. United States, 639 F. Supp. 2d 1169, 1180 (D. Haw. 2009) ("Ethnicity does not explain, for example, why many rapid consecutive purchases were made by the same recipient").

The FNS also asserts the Plaintiff's tax and invoice records do not support the amount of sales charged to food stamp accounts. Doc. 24, Administrative Record, 127-128. Plaintiff claims his accounting was in error and amended his tax returns. Doc. 24, Administrative Record, 153-163. However, he did not address the FNS observation that his purchases of wholesale food items (as reflected by his invoices) were of insufficient quantities to match up with the food stamp redemptions, putting aside all his other non-food stamp, retail sales.

## V. Order

The United States's motion for summary judgment is GRANTED.

IT IS SO ORDERED.

Dated: January 8, 2013

UNITED STATES DISTRICT JUDGE